# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE-OPELOUSAS DIVISION

**ROBERT H. RHYNE, JR.**                    **CIVIL ACTION NO. 08-CV-00594**
**BRENT TRAUTH**

**VERSUS**                                  **JUDGE DOHERTY**

**OMNI ENERGY SERVICES CORP.**              **MAGISTRATE JUDGE METHVIN**
**RICHARD ADAM "RICK" MAGER**
**COVE PARTNERS, LLC**
**DENNIS R. SCIOTTO**
**EDWARD E. COLSON, III**
**RICHARD C. WHITE**
**BARRY E. KAUFMAN**
**RONALD E. GEREVAS**
**BRIAN J. RECATTO**
**RONALD D. MOGEL**

*REPORT AND RECOMMENDATION ON*
*DEFENDANTS' MOTIONS TO DISMISS*
*(Rec. Docs. 23, 31, 35, and 40)*

Before the undersigned are two motions to dismiss (Rec. 35, 40), which supercede and

replace the previous motions to dismiss filed in this matter (Rec. 23, 31). The current motions to

dismiss were filed in response to plaintiffs' amended complaint.

The pending motions are as follows:

1.  Motion to Dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6),
    filed by defendants OMNI Energy Services Corp., Dennis R. Sciotto, Edward E.
    Colson, III , Richard C. White, Barry E. Kaufman, Ronald E. Gerevas, Brian J.
    Recatto, and Ronald D. Mogel, collectively hereinafter referred to as the "Omni
    Defendants;"[1] and,

2.  Motion to Dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6),
    filed by defendants Richard Adam "Rick" Mager and Cove Partners, LLC,
    hereinafter collectively referred to as the "Advisor Defendants."[2]

---

[1]Rec. Doc. 35.

[2]Rec. Doc. 40.

The assigned district judge referred the motions to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The motions are opposed.

### Background and Allegations

Plaintiffs are the former sole shareholders of a company called Preheat, Inc., which plaintiffs sold to defendant OMNI through a Stock Purchase and Sale Agreement (SPSA).

Defendants in the action are OMNI and members of its Board of Directors – Sciotto, Colson, White, Kaufman, Gerevas, and Recatto – and Mogel, who is OMNI's Senior Vice President and Chief Financial Officer. Cove Partners, LLC is an investment company, and Mager is an investment advisor with Cove.

The plaintiffs allege in their complaint that defendants have committed securities fraud in violation of Sections 10(b), 13(d), and 20(a) of the Securities Exchange Act of 1934,[3] and Rules 10b-5 and 13d-1 promulgated thereunder.[4] In addition, plaintiffs allege they were wrongfully denied ERISA benefits under the Employee Retirement Income Security Act of 1974,[5] due to improper termination of their employment contracts. Plaintiffs also allege violations of Louisiana law.

At the beginning of their 64-page complaint, plaintiffs ask for the following relief:

(1)    Judgment declaring the Stock Purchase and Sale Agreement an absolute nullity considering 28 U.S.C. § 2201 and Louisiana Civil Code article 2033, procedurally, and Sections 10(b), 13(d) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b), 78m(d) and 78t(a)) and Louisiana Civil Code

---

[3] 15 U.S.C. §§ 78a - 78mm, specifically, §§ 78j(b), 78m(d), and 78t(a).

[4] 17 C.F.R. §§ 240.10b-5 and 240.13d-1.

[5] 29 U.S.C. § 1001 et seq.

articles 7 and 2030, substantively; and Judgment declaring Rhyne has rights to employment benefits under ERISA;

(2)     Injunctive relief pursuant to 28 U.S.C. § 2202, halting Defendants' continuing violations of the Exchange Act and SEC regulations by removing Defendants Dennis R. Sciotto, Ronald E. Gerevas, and Edward E. Colson, III from OMNI's Board of Directors; and by ordering Defendants to publish information correcting existing material misrepresentations and omissions; and

(3)     Damages, pursuant to 28 U.S.C. §2202, and Louisiana Civil Code articles 1958, 1997, 2018 and 2033, resulting from nullification of the SPSA, or bad faith breach of the SPSA, damages for default on the Notes, damages for Defendants' conduct which diminished the value of that portion of the Preheat purchase price paid in OMNI stock, and for failing to prudently manage Preheat to realize maximum value.

On the day the original complaint was filed on behalf of Rhyne, April 30, 2008, Trauth was still working for Omni. Trauth's claims were added in the Amended Complaint. Plaintiffs allege that, "[o]n May 12, 2008, in obvious retaliation after most of the defendants were served with the original complaint, Trauth's employment with Preheat was abruptly and ridiculously terminated at the direction of the Defendants without any arguable cause or, as further detailed below, any factual or even rational basis."[6]

Plaintiffs ask for declaratory and injunctive relief and monetary damages as follows:

a.      Judgment declaring that Defendants have violated and continue to violate, the United States' securities laws; that the SPSA is an absolute nullity for fraud and bad faith breach, and that Plaintiff Rhyne was terminated on February 8, 2008, without cause, and that Plaintiff Trauth was effectively terminated without cause before May 12, 2008, and therefore each has rights under ERISA to his employee benefits through the end of 2008;

b.      Judgment against all Defendants, jointly, severally, and *in solido*, for all damages, foreseen and unforeseeable, in an amount to be proven at trial, which include: 1) at least $35,000,000 representing the value of Preheat, which cannot be returned in kind, and $50,000,000 in revenues generated by Preheat during OMNI's

---

[6] *Id.*, p.3.

unlawful possession, with no credit against these damages in favor of the fraudulent actors, or bad faith Defendants;

c.    Injunction: (a) preventing OMNI and Defendants from continuing to violate the securities laws by requiring full and complete corrective disclosures; and (b) removing the San Diego Directors from OMNI's Board and Board Committees;

* * *

According to plaintiffs, they created and developed an oilfield business, Preheat, Inc., which began as a garage-based company and grew into "one of the leading oilfield rental and service companies in Louisiana providing specialized rental equipment on about 50 percent of the drilling rigs operating in the Gulf of Mexico."[7]  It is unclear exactly when negotiations began between Preheat and OMNI for Preheat's sale, but on September 9, 2005, OMNI issued a letter of intent to the plaintiffs memorializing the terms under which OMNI would buy all of Preheat's outstanding shares of stock, which were owned solely by Plaintiffs. (¶ 43).

On December 29, 2005, plaintiffs entered into the SPSA, by means of which plaintiffs sold 100% of their stock in Preheat to OMNI for $23.6 million dollars, payable as follows:

(a)    a $16 million Closing Cash Payment to Plaintiffs;

(b)    Seller Note No. 1 to Plaintiffs, in the amount of $2,666,666.66 bearing interest at five percent per annum and maturing two years from the Closing Date;

(c)    Seller Note No. 2 to Plaintiffs, in the amount of $533,333.34 bearing interest at five percent per annum maturing three years from the Closing Date;

(d)    900,000 shares of restricted OMNI common stock split equally among Plaintiffs, on the Closing date at an Issue Share Price of $2.78/share (900,000 x $2.78 = $2,500,000); and

(e)    OMNI's assumption of Preheat's then current long term debt obligations up to $1,868,000. (¶ 47).

---

[7] Amended Complaint, Rec. Doc. 30, p. 2, ¶ 1.

The SPSA also required plaintiffs to execute and deliver employment and non-compete agreements with OMNI. (¶ 52).

Seller note number 1 matured February 9, 2008, and note number 2 matured February 9, 2009. (¶ 50). The SPSA provided if either Rhyne or Trauth would resign or be terminated for cause prior to the maturity date of either or both of OMNI's notes, then up to $3.2 million, depending on the date of the termination or resignation, would be surrendered by plaintiffs to OMNI and cancelled by OMNI. (¶ 50).

Plaintiffs' primary complaints, in a nutshell, are that Sciotto and Colson concealed their intentions to control OMNI and to replace its Board members with a California based "cabal" of their friends and business associates. Plaintiffs assert Sciotto and Colson are not true business people, but are corporate raiders, who have no intention of running OMNI as a legitimate business. To that end, plaintiffs allege Sciotto secretively bought large shares of OMNI common stock, and then engineered, through Mager and Cove, a financial disaster for OMNI, which required OMNI to issue Preferred Shares of stock to secure financing for its own rescue. Sciotto and Colson then purchased those Preferred Shares, giving them control over OMNI. Plaintiffs allege Sciotto and Colson caused themselves to be appointed to OMNI's independent boards, even though they are not independent, based on misrepresentations of their extensive business backgrounds that justified their placement there.

Once in control of OMNI, plaintiffs allege that Sciotto and Colson, with the help of Mager and Cove, in March, May and July of 2006, floated false information that OMNI was "in play" and for sale on the market. (¶ 107). This misrepresentation caused the price of OMNI stock to rise. Meanwhile, Sciotto and Colson had invested, through non-related, non-defendant

companies, in futures trading in OMNI stock. When Sciotto and Colson refused to accept legitimate offers for OMNI in 2007, the price of its stock fell, and Sciotto and Colson reaped enormous profits from their short positions in OMNI stock. (¶ 122, 123).

Plaintiffs allege their OMNI stock lost value as result of these machinations. According to plaintiffs, Rhyne sold 225,000 of his OMNI shares in late September and early October, 2007, at or about eight dollars per share, and Trauth sold a similar large block about one month later, at about seven dollars per share. (¶ 125).

Plaintiffs allege Rhyne was wrongfully terminated on February 8, 2008, Trauth on May 12, 2008, and OMNI has defaulted on the notes held by plaintiffs in the amount $3.2 million. (¶¶ 1, 2,15). Plaintiffs allege OMNI fired them without cause prior to the maturity dates of the OMNI notes in order to avoid payment of same, and violated their ERISA rights by terminating their employment benefits, including health insurance benefits.

After OMNI terminated Rhyne in February 2008, plaintiffs sold most of their remaining OMNI shares at prices of less than four dollars per share. However, Rhyne did not sell all of his OMNI shares, and remains a shareholder in OMNI. (¶ 125).

Plaintiffs make multiple allegations of misrepresentations and omissions by defendants OMNI, Sciotto, Colson, Cove and Mager. The alleged misrepresentations and omissions are wide-ranging and scattered throughout the Complaint. However, they basically fall into two categories: first, those misrepresentations and omissions designed to conceal Sciotto and Colson's intent to control OMNI; secondly, those misrepresentations designed to conceal defendants Sciotto, Colson, Cove and Mager's design to profit from "insider raiding" by

manipulating the price of OMNI stock and trading OMNI futures contracts through other, non-defendant companies.

In the first category, intent to control OMNI, fall the following misrepresentations and omissions: Sciotto's statement in November 4, 2004, on his Schedule 13G (Statement of Beneficial Ownership) that he owned more than 5% of OMNI common stock outstanding, but that he had no intent to control OMNI (¶ 16); Mager's failure to disclose that the fairness opinion concerning OMNI's issuance of Series C Preferred Private Placement shares was not issued by an independent third party, but was issued by Mager, OMNI's paid investment advisor (¶ 22); Sciotto's May 17, 2005, Schedule 13D, which did not disclose that the total Series C shares issued was 5,000, he received 2,660, or 53.2% of those shares, or that he controlled two OMNI board seats (¶ 26); Sciotto and Colson's misrepresentations regarding their business backgrounds in their biographies in OMNI's SEC filings and in OMNI's June 13, 2005, Press Release (¶ 30); and, the failure of Colson to file his SEC Form 3 disclosing his initial beneficial ownership in OMNI until September 7, 2005. (¶ 42).

In the second category, intent to conceal their design to profit from "insider raiding" by manipulating the price of OMNI stock and trading in OMNI futures contracts, fall the following misrepresentations and omissions: Sciotto and Colson's failure to disclose they have twice listed a different house in San Diego together as their primary residence (¶ 26); Sciotto and Colson's failure to disclose that they are voting their shares together (¶ 26); Sciotto and Colson's failure to disclose that Sciotto, Mrs. Sciotto, Colson, and Sciotto's next-door neighbor bought controlling interests in Welsh Money Management, and that their total position is invested in market timing day trades in OMNI futures contracts (¶ 26); Sciotto and Colson's

misrepresentation that OMNI was "in play"and for sale when they had no intention of accepting any purchase offer for OMNI (¶¶ 106 -109); Sciotto and Colson's failure to disclose that they had,  through outside investment companies, bought short positions in OMNI stock; (¶¶ 106 - 109); Mager's authoring of proposed changes to the minutes of an OMNI special board meeting, wherein Sciotto's agreement to accept an offer of $7.50 per share for OMNI stock was deleted (¶ 108); Mager's misrepresentations to OMNI Board members regarding the value of OMNI stock and the quality of Citigroup's documents (¶¶ 110, 114, 116 - 119); Sciotto, Colson, White, Kaufman and Gerevas' failure to disclose the offers made to purchase OMNI.  (¶ 120).

Plaintiffs allege they relied on these misstatements and omissions in making their decision whether to agree with the terms of the Letter of Intent to enter into the SPSA, particularly the terms regarding acceptance of interest-bearing promissory notes for $4 million dollars, "and to let OMNI defer the date it would ultimately pay the Plaintiffs the last installment of this $4 million debt for three (3) years." (¶ 43).  Plaintiffs explain they "were forced to consider whether OMNI was likely to continue as a going and solvent concern over that three year period, and whether there were any reasons for concern over the likelihood that OMNI would ultimately pay the amounts owed when the Notes matured."  (¶ 44).  Plaintiffs allege that because the terms of the sale of Preheat required continued employment of them by OMNI, and because payment of full amount of the OMNI notes was conditioned on that employment, they "necessarily relied on the misrepresentations made by OMNI, Sciotto, and Colson, as well as their omissions of disclosing the fact that two of the 'independent'" directors of OMNI were working in concert with each other for their own purposes." (¶ 46).

Plaintiffs also allege, in a single paragraph, that defendants Sciotto, Colson, and Gerevas, the "Carlsbad Cabal" and other OMNI officers engaged in insider trading in early 2008, by buying OMNI stock, knowing that OMNI had a pending acquisition of Industrial Lift Truck and & Equipment Co., Inc. (¶ 126).

Plaintiffs also allege that defendants White and Kaufman allowed Sciotto and Colson, beginning in June, 2005, to sit on OMNI's Independent Boards, and breached their fiduciary duties to maintain the mandated independence of OMNI's Board. (¶ 29, 41), and that defendants Sciotto, Colson, White, Kaufman, Gerevas, Recatto and Mogel have breached their obligations as members of OMNI's Board of Directors by failing to ensure that OMNI's SEC filings, press releases and public statements were and are accurate, and properly disclose all material information. (¶ 130).

In addition to alleging violations of federal securities laws, plaintiffs allege the SPSA is an absolute nullity under Louisiana Civil Code article 7; alternatively, that defendants violated Louisiana law by breach of the SPSA, bad faith termination of plaintiffs' employment contracts and termination of their ERISA benefits, and default under the OMNI notes to plaintiffs.

Plaintiffs allege the SPSA is an absolute nullity, as it was a contract with an illegal object, due to its having been confected in violation of federal securities laws. Alternatively, plaintiffs allege defendants breached the SPSA by terminating Rhyne on February 8, 2008, the day before maturity of Seller Note No. 1 by OMNI, on fabricated grounds that Rhyne had breached his non-compete agreement in an effort to "weasel out of the $2.667 million due the next day. (¶¶ 67, 70). Plaintiffs allege Trauth was terminated on May 9 or 12, 2008, on fabricated grounds that

Trauth had abandoned his position and resigned his employment with OMNI. (¶¶ 1, 2, 82). Plaintiffs allege that these terminations were a violation of the Plaintiffs' Employment Agreement, and made in bad faith by OMNI to avoid its obligations under the Notes. (¶ 146).

Plaintiffs also allege they are qualified under ERISA for the benefit plans available to OMNI's salaried, exempt employees, including sick and disability leave, health insurance, and 401(k) plans, and ask the court to declare their entitlement to ERISA, and that they have been wrongfully denied same. (¶ 147, 148, 149).

### *Motions to Dismiss*

In their motion to dismiss, the OMNI defendants argue plaintiffs' securities fraud claims do not satisfy the elements of a Rule 10b-5 action, and the complaint does not meet the heightened pleading requirements of the Private Securities Litigation Reform Act (PSLRA)(15 U.S.C. § 78u-4) or Fed. R. Civ. P. Rule 9(b).

Generally, as to the allegations of securities fraud, defendants argue plaintiffs have failed to adequately plead facts leading to a strong inference of scienter, have inadequately pled reliance, and have failed to adequately allege loss causation, as plaintiffs have alleged no economic damages resulting from any of defendants' alleged omissions or misrepresentations.

Specifically, defendants argue there were no misrepresentations or omissions made regarding defendants Sciotto and Colsons' intent to control OMNI, because Sciotto and Colson's ownership of OMNI shares and positions on the Board were disclosed and known in 2005, many months before the SPSA was entered into. Defendants argue plaintiffs' allegations of misrepresentations regarding Sciotto and Colson's business experience are factually wrong, and

even assuming the allegations had any truth, do not constitute securities fraud, as plaintiffs do not explain why these misrepresentations affected their decision to sell Preheat to OMNI.[8]

Defendants also argue that plaintiffs' allegations regarding the inside raiding scheme are wildly speculative and not supported by sufficient factual allegations concerning any alleged offers made for OMNI stock, the companies through which Sciotto and Colson allegedly engaged in futures trading of OMNI stock, or the specific trades alleged to have occurred.[9]

Defendants contend that plaintiffs' allegations that OMNI officers and directors engaged in inside trading by purchasing OMNI stock when they knew an acquisition by OMNI was imminent, is unsupported by sufficient factual allegations to survive the motion to dismiss.[10]

Defendants also argue the complaint violates the prohibition against "group pleading" against the individual defendants. Furthermore, defendants contend that there is no primary securities law violation adequately alleged against OMNI, the individual defendants cannot be liable as control persons under Section 20(a) of the Exchange Act, and those claims against the individual defendants must be dismissed.[11]

Regarding the state law claims, defendants argue the plaintiffs' claims for absolute nullity under Louisiana law must be dismissed, as absolute nullity does not apply to contracts that are voidable due to a lack of consent. Instead, absolute nullity is applicable to contracts that are void

---

[8]*Defendants' Memorandum in Support of Motion to Dismiss Plaintiffs' Amended Complaint* (rec. doc. 36-2), p. 6.

[9]*Ibid.*, pgs. 7, 10, 17 - 22.

[10]*Ibid.*, pgs. 22 - 23.

[11]*Ibid.*, pgs. 9 - 10.

as against public order and good morals, which the SPSA is not.[12] Defendants argue the state law breach of contract claims should be dismissed because plaintiffs were engaged with another company, which is cause for termination under their employment agreements.[13] Finally, defendants argue ERISA does not apply to cases where the loss of benefits under an employee plan is due to termination, and these claims must be dismissed.[14]

The Advisor Defendants, Mager and Cove, reiterate and adopt the OMNI defendants' arguments in their motion to dismiss. In addition, Mager and Cove argue the amended complaint does not allege that either were directly involved in the negotiation or sale of Preheat to OMNI, which they argue forms the basis of the federal securities claims, or the employment agreements between OMNI and plaintiffs, which forms the basis of the state law claims. Therefore, all claims against them should be dismissed.[15]

The defendants do not directly address plaintiffs' claims for declaratory and injunctive relief, but ask that all of plaintiffs' claim be dismissed for failure to state a claim. Therefore, the undersigned will make a recommendation regarding those claims for declaratory and injunctive relief, as well as plaintiffs' claims for damages.

*Applicable Legal Standards and Analysis*

The undersigned will address the motions to dismiss first by analyzing whether plaintiffs have stated any claim for damages or injunctive relief under federal law, whether under the

---

[12]*Ibid.*, pgs. 32 - 24.

[13]*Ibid.*, pgs. 28 - 31.

[14]*Ibid.*, pg.s 34, 35.

[15]*Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted* (rec.doc. 35).

Securities Exchange Act, ERISA, or otherwise, and then address whether plaintiffs have stated any claim under Louisiana law, if appropriate.

## I.     Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 8(a)(2) generally requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 103 (1957); Bell Atlantic Corp. v. Twombly, 550 U. S. 544, 127 S.Ct. 1955, 1959 (2007).  The court should accept "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."  Jones v. Greninger, 188 F.3d 322, 324 (5th Cir.1999); Martin K. Eby Const. Co., Inc. v. Dallas Area Rapid Transit, 369 F.3d 464, 467 (5th Cir.2004).

"To survive a Rule 12(b)(6) motion, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.' " In re Katrina Canal Breaches Litigation, 495 F.3d 191, 205 (5th Cir.2007) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic, 127 S.Ct. at 1964-65 (citations, quotations marks, and brackets omitted).[16]  Courts "are not bound to accept as true a legal

---

[16]The previous 12(b)(6) standard – that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief" is no longer "the minimum standard of adequate pleading to govern a complaint's survival." Katrina Canal, 495 F.3d at 205, fn. 10 (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957) and Bell Atlantic, 127 S.Ct. at 1968-69, respectively).

conclusion couched as a factual allegation." Id, 127 S.Ct. at 1965, *citing* Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932 (1986).

II.      Federal Securities Law Damage Claims

    A.      Section 13(d) Claims

Section 13(d) of the Exchange Act reads as follows:

(a)  Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is specified in paragraph (I) of this section, is directly or indirectly the beneficial owner of more than five percent of the class shall, within 10 days after the acquisition, file with the Commission, a statement containing the information required by Schedule 13D (§ 240.13d-101).
* * *
(d) Any person who, as of the end of any calendar year, is or becomes directly or indirectly the beneficial owner of more than five percent of any equity security of a class specified in paragraph (I) of this section and who is not required to file a statement under paragraph (a) of this section by virtue of . . . [statutory exemptions], shall file with the Commission, within 45 days after the end of the calendar year in which the person became obligated to report under the paragraph (d), a statement containing the information required by Schedule 13G (§ 240.13d-102).

Plaintiffs allege that defendants "violated the requirements of Section 13 of the Exchange Act by not disclosing their intentions to control OMNI, causing harm to Plaintiffs," and ask for damages. (¶ 12*).*

All claims for damages based upon the defendants' alleged violations of Section 13(d) must be dismissed, as it provides no private right of action for damages.  Motient Corp. v. Dondero, 529 F.3d 532 (5th Cir. 2008).  The Fifth Circuit has stated as follows:

The Williams Act was enacted to protect shareholders who are forced to make decisions between bidders and management.  Since any material misstatement or omission to an investor who purchases or sells the security and actually relies on that information gives rise to a private cause of action under Section 18(a) of the Exchange Act, 15 U.S.C. § 78r(a), Section 18(a) provides the sole basis for a private right of action for damages resulting from a violation of Section 13(d).

Motient, 529 F.3d at 536, referencing Hallwood Realty Partners, L.P. v. Gotham Partners, L.P., 286 F.3d 613, 620 (2d Cir. 2002).

Plaintiffs have made no claim under Section 18(a), and their claims for damages under Section 13(d) must be dismissed.

### B.    Section 10(b) and Rule 10b-5 Damages Claims

Section 10(b) of the Exchange Act makes it unlawful for any person:

> To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
> 15 U.S.C. § 78j(b).

Thus Section 10(b) bars conduct "'involving manipulation or deception,' manipulation being 'practices ... that are intended to mislead investors by artificially affecting market activity,' and deception being 'misrepresentation, or nondisclosure' intended to deceive." Field v. Trump, 850 F.2d 938, 946-47 (2d Cir.1988), citing Santa Fe Industries v. Green, 430 U.S. 462, 477 97 S.Ct. 1292, 1303 (1977).

Rule 10b-5 proscribes the following conduct:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
> 17 C.F.R. § 240.10b-5

The Supreme Court in <u>Stoneridge Inv. Partners, LLC v. Scientific-Atlanta</u>, 128 S.Ct. 761, 768 (2008), listed the elements of a cause of action under Rule 10b-5 as follows:

> In a typical §10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *See* <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 341-342, 125 S.Ct. 1627 (2005).

According to plaintiffs, and not disputed by defendants, plaintiffs' sale of Preheat's stock to OMNI and acceptance of OMNI stock and notes as part of the purchase price of Preheat make the SPSA a purchase or sale of securities covered by the Exchange Act. At issue are the remaining elements of (1) a misstatement or omission of material fact (2) made with scienter . . . (4) reliance on the misrepresentation (5) economic loss and (6) loss causation. <u>Stoneridge Inv. Partners, LLC v. Scientific-Atlanta</u>, 128 S.Ct. 761, 768 (2008).

In addition to satisfying the elements of a cause of action under Rule 10b-5, plaintiffs must also meet the enhanced pleadings requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. §78u-4.

The Court in <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), discussed the PSLRA's heightened pleading requirement for the scienter element of a 10(b) claim as follows:

> Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," § 78u-4(b)(2).
> <u>Tellabs</u>, 127 S.Ct. at 2508.

Tellabs instructed courts as follows regarding the scienter requirement:

> We establish the following prescriptions: *First*, faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.
>
> *Second*, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. . . . The inquiry, as several Courts of Appeals have recognized, is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.
>
> *Third,* in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. Tellabs, 127 S.Ct. at 2509 (internal citations omitted).

In addition to exacting requirements for the scienter element, the PSLRA requires a plaintiff to adequately plead economic damages in order to survive a Rule 12(b)(6) dismissal of a 10(b) claim. Under the PSLRA, "[a] private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss." Dura Pharmaceuticals v. Broudo, 544 U.S. 336, 338, 1125 S.Ct. 1627, 1629 (2005). A failure to allege or prove actual damages will result in dismissal of a 10b-5 damage claim. See Romano v. Merrill Lynch, Pierce, Fenner & Smith, 834 F.2d 523, 527 (5th Cir. 1987). Thus, under Dura and Romano, only those misrepresentations or omissions alleged to have caused an actual economic loss need be further assessed for materiality, reliance, and scienter.

In an effort to simplify the analysis of whether plaintiffs have stated a 10(b) claim for securities fraud in their sixty-eight page complaint, the undersigned will first assess whether

plaintiffs have adequately alleged any economic loss caused by defendants' alleged misrepresentations or omissions.

The plaintiffs' complaint asks for damages resulting from nullification or bad faith breach of the SPSA in the form of the value of Preheat's stock, as well as the revenues generated by Preheat during OMNI's unlawful possession of same.[17]   If the SPSA is enforceable, plaintiffs ask for damages for breach of the SPSA, including payment of the OMNI notes and "all other damages resulting from Defendants' conduct which diminished the amount Plaintiff realized on that portion of the purchase price satisfied by delivery of 900,000 shares of OMNI stock.[18] Thus, plaintiffs allege their losses to be as follows: a) their stock in Preheat; b) the diminished value of the OMNI stock; and, c) the value of the OMNI Notes.

1.       Loss of Preheat Stock

Plaintiffs express regret for entering into the SPSA and selling Preheat to OMNI, and allege they would not have entered into the SPSA but for defendants' misrepresentations and omissions.  However, as pointed out by defendants, this is an allegation of transaction causation, not loss causation.[19]  Under Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341-42 (2005), a party must show both transaction causation (the alleged misrepresentation or omission caused the transaction to occur) and loss causation (the misrepresentation caused an economic injury to the plaintiff).

---

[17]Complaint, ¶ 155.

[18]Complaint, ¶ 159.

[19]Reply Memorandum  in Support of Motion to Dismiss  (rec. doc. 50), p. 13, citing ATSI Communications,  Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 107 (2d Cir. 2007).

Plaintiffs sold Preheat to OMNI for $23.6 million dollars. Plaintiffs have not alleged any economic loss due to their sale of Preheat stock to OMNI – only the loss of the Preheat stock itself, which they sold and were compensated for. Plaintiffs do not allege that the value of Preheat's stock, or OMNI's stock or notes was misrepresented in the SPSA. Plaintiffs have cited no authority for their argument that the loss can be other than one that can be measured economically – such as an intangible regret for loss of their company, Preheat – at least not under federal securities laws.

The undersigned will recommend dismissal of all of plaintiffs' 10(b) securities fraud claims relating to plaintiffs' loss of Preheat stock, due to plaintiffs' failure to adequately allege any economic loss caused thereby.

Alternatively, even if the sale of Preheat stock could somehow be regarded as an economic loss, plaintiffs have failed to plead a material misrepresentation or omission that they relied on in making their decision to enter into the SPSA.

a       Alleged misrepresentations and omissions by defendants Sciotto and Colson and OMNI regarding Sciotto and Colson's intent to control OMNI.

First, plaintiffs allege that Sciotto concealed his intent to control OMNI by various misstatements and omissions. Specifically, plaintiffs allege Sciotto misrepresented his intent to control OMNI in his September 22, 2004, Schedule 13G (Statement of Acquisition of Beneficial Ownership) with the SEC. Plaintiffs alleged Sciotto had purchased over 5% of OMNI common stock, yet certified that he had not intention of controlling OMNI. (¶ 16). Plaintiffs assert this was a misrepresentation because eight months later he took control of OMNI. However, plaintiffs also allege that on February 11, 2005, and again on March 14, 2005, prior to the SPSA,

Sciotto filed amendments on Schedule 13G/A with the SEC which disclosed that he controlled more than 1,000,000 shares of OMNI common stock, approximately 8.8% of OMNI's issued and outstanding stock. (¶ 20).

Plaintiffs also allege that OMNI failed to disclose the fairness opinion on the Series C Preferred Private Placement shares was given by Mager and Cove, and was not given by an independent third party. ¶22. Plaintiffs allege this biased fairness opinion resulted in an over-issuance of warrants, and Sciotto and Colson collectively received approximately 5.5 million of these warrants. (¶ 22,23). Plaintiffs allege "[O]n July 6, 2005, OMNI disclosed that within sixty days, Sciotto could, on a fully diluted and favorable basis, beneficially own and/or control 7,967,200 shares, over 50% of OMNI's 13,963,311 then outstanding shares." (¶ 26). However, plaintiffs acknowledge OMNI's June 17, 2005, SEC Form 8-K announced that Sciotto and Colson had been appointed to the Board of Directors. (¶ 27). The plaintiffs also acknowledge Colson filed his SEC Form 3 on September 7, 2005, disclosing his Initial Statement of Beneficial Ownership in OMNI. (¶ 42).

The undersigned finds no allegation of any material misrepresentation or omission regarding Sciotto or Colson's ownership interest and intent to control OMNI. While the information regarding Sciotto and Colson's ownership and control may have been delayed, it was available well before the SPSA was entered into on December 29, 2005. SEC filings made prior to the plaintiffs' sale of Preheat stock to OMNI indicate a clear intent by Sciotto and Colson to obtain a controlling interest in OMNI, and at the time of the SPSA, Sciotto and Colson's controlling interest in OMNI was easily discerned.

     b.     Misrepresentations and omissions regarding relationships

The plaintiffs allege misrepresentations and omissions by Colson, Sciotto, Geravas, Cove and Mager regarding their past business relationships with each other as a "cabal" engaging in questionable business practices such as, *inter alia*, insider raiding and insider trading.

At the outset, Geravas became a member of the OMNI Board on January 23, 2008, well after the SPSA was entered into. Therefore, any claims that Gerevas caused plaintiffs' loss of Preheat stock through entry into the SPSA must be dismissed, and plaintiffs make no allegations that Mager or Cove made any misrepresentations or omissions to plaintiffs at all.

Furthermore, plaintiffs themselves, in attempting to craft breach of fiduciary duty allegations against defendant board members White and Kaufman, state that "all information regarding their [Colson, Sciotto, Geravas, Mager and Cove's] relationships is available on the internet and it was negligent for them to appoint them as independent [directors or members of the board]. . . ." The undersigned submits that if the omitted relationship information was available to White and Kaufman, then it was available to plaintiffs, and thus the defendants' participation in the alleged "cabal," even if it were everything the plaintiffs allege it to be, was not a material omission or misrepresentation.

c.  Misrepresentations and omissions regarding Sciotto and Colson's business experience

Plaintiffs also allege defendants Sciotto and Colson misrepresented their addresses and business qualifications. Specifically, Colson's address was incorrectly listed as "Marmal Court" instead of "Marmol Court," both described themselves as owners of FF Properties and Muchas Gracias restaurants, and they falsely claimed they had extensive business management experience in their biographies included in OMNI's SEC filings. (¶ 28 - 40).

Plaintiffs allege OMNI's June 13, 2005 Press Release stated Sciotto and Colson were the "co-founders of FF Properties, a real estate holding company" and "[t]ogether they founded a chain of Mexican-food restaurants operating principally in the Northwestern United States." (¶ 30). On July 6, 2005, on SEC FORM PRE 14A (Preliminary Proxy Statement), OMNI published statements that Colson and Sciotto were "founder[s] and co-owner[s] of FF Properties, a real estate holding company created in 1988 ...specializes in the acquisitions of commercial properties suitable for drive through restaurants" and "co-creator[s] of the Mexican restaurant chain ...named Muchas Gracias. (¶ 31). Plaintiffs allege these statements were published repeatedly by OMNI throughout 2005, on July 18, 2005, and again on December 13, 2005, two weeks prior to plaintiffs' sale of Preheat to OMNI through the SPSA. (¶ 31).

Plaintiffs allege these statements are false, as FF Properties is a Fictional Business Name, not a recognized juridical entity, and is registered to Colson only. (¶ 33, 34). Plaintiffs allege the "true" FF Properties, Inc., owns or manages billions of dollars in real estate, and Colson and Sciotto intentionally "used the name 'FF Properties' to confuse readers of OMNI's SEC filings into thinking that they co-founded FF Properties, Inc. (the multibillion dollar company), and to conceal their lack of business management experience. (¶ 34).

Plaintiffs also allege the statement that Sciotto and Colson co-founded the Mexican restaurant chain Muchas Gracias in 1995 is false – Muchas Gracias was founded by a Mexican immigrant, Rodolfo Sanchez, and the only connection Colson and Sciotto have with Muchas Gracias is that their family trusts are partial owners of three pieces of commercial real estate used by Muchas Gracias to operate Mexican restaurants, beginning in 2001. (¶¶ 35, 36). On July 5,

2007, OMNI corrected Colson and Sciotto's biographies to delete the claim that they were co-founders of Muchas Gracias. (¶37).

Plaintiffs argue these misrepresentations by Sciotto and Colson of business experience they did not have allowed Sciotto and Colson to serve on independent boards of OMNI, despite their non-independent status, as an exception to SEC rules. However, the loss plaintiffs allege is their sale of Preheat stock to OMNI. It is a causative stretch to link this alleged misinformation to the plaintiffs' decision to enter in the SPSA. However, even assuming causation between the misinformation and the plaintiffs decision to enter into the SPSA, the scienter requirements of the PSLRA are not adequately pled.

In determining whether scienter has been met, the undersigned must consider, whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. Tellabs, 127 S.Ct. at 2509 (internal citations omitted).

Plaintiffs argue Sciotto and Colson must have made these misstatements with scienter, as they are biographical information, of which they must have known the falsehood. However, the "Marmal"/ "Marmol" error could well be simple typographical error, and "FF Properties" is not such an unusual name that one would or should automatically assume the name meant "FF Properties, Inc." There are likely many reasons why such a name was chosen other than plaintiffs' conclusion that the name must necessarily have been chosen to confuse investors.

The statements concerning Sciotto and Colson's "co-founding"or "co-owning" of the Mexican restaurant chain Muchas Gracias, which plaintiffs allege was false, may well have been an exaggeration of Sciotto and Colson's involvement with Muchas Gracias. However, plaintiffs

concede that Sciotto and Colson did have, through their families' trusts, some involvement in the land used for several Muchas Gracias restaurants. In any case, exaggeration of one's involvement in a successful business may establish puffing, but does not establish intent to misrepresent their business experience to an extent to induce plaintiffs to enter into the SPSA.

The undersigned finds that the plaintiffs' allegations regarding misrepresentations and omissions by defendants Sciotto, Colson, Gerevas, Mager and Cove, regarding Sciotto and Colson's intent to control OMNI, their past relationships, and Sciotto and Colson's business backgrounds either were not material misrepresentations or omissions, were , or were not made with scienter.

For all of the above reasons, the undersigned will recommend dismissal of all of plaintiffs' 10(b) securities fraud claims relating to plaintiffs' loss of Preheat stock through entry into the SPSA.

2. Loss of Value of OMNI Stock

Plaintiffs also allege their OMNI stock lost value due to Sciotto, Colson, Mager and Cove's inside raider scheme. Specifically, plaintiffs allege Sciotto, Colson, Mager and Cove leaked false information that OMNI was "in play," or on the market for purchase, when they had no intention of accepting any offer for OMNI. Instead, the purpose of the leak was to temporarily raise the stock price for OMNI, so that Sciotto and Colson could benefit from short positions in OMNI stock that they held through other unrelated companies; when Sciotto and Colson rebuffed the offers, OMNI's stock price fell, and Sciotto and Colson reaped the benefit through their short positions.

Out-of-pocket losses are the standard measure of damages for a 10b-5 claim, and are defined as: "the difference between the fair value of all that the . . . seller received and the fair value of what he would have received had there been no fraudulent conduct. . . except for the situation where the defendant received more than the seller's actual loss.  In the latter case damages are the amount of the defendant's profit." Affiliated Ute Citizens of Utah v. U.S., 406 U.S. 128, 155, 92 S.Ct. 1456, 1473 (1972)(internal citations omitted).

The OMNI stock was purchased by plaintiffs as part of the SPSA at a value of $2.78 per share. According to the plaintiffs' complaint, Rhyne sold most of his shares in late September and early October 2007, at about $8 per share.  Trauth sold a large block of his shares about a month later, at approximately $7 per share.  After Rhyne was terminated, the plaintiffs sold most of their remaining shares in OMNI for less than $4 per share.  (¶ 125).  Thus, according to plaintiffs' own allegations, their OMNI stock lost no value from the time they accepted it as partial payment for Preheat, to the time they sold it.

However, plaintiffs allege "[h]ad Plaintiffs known of these material misrepresentations and omissions [defendants' alleged false information that OMNI was "in play" and for sale], they *could have* sold their stock when it reached a trading high of $12.74 on June 30, 2007." (¶ 121)(Emphasis added).  Plaintiffs do not allege that they actually purchased or sold any OMNI shares as a result of these alleged misrepresentations and omissions.  Instead, they allege they held their shares, and that was the cause of their loss –  not a purchase or sale.

In order to have standing to assert a securities fraud claim, a person must allege they bought or sold based on an alleged fraud, which neither plaintiff alleges he did based on the misrepresentations regarding OMNI's being "in play."  See Blue Chip Stamps v. Manor Drug

<u>Stores</u>, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Instead, plaintiffs allege a "holding violation," where they assert they would not have held their shares, but would have sold at the peak price, if they had known same was caused by a false statement that OMNI was in play, and was inevitably going to fall when the truth was revealed.

Under Third Circuit case law, but not clear in the Fifth Circuit, a plaintiff can, in some circumstances, maintain a 10b-5 action based on "lost opportunity" damages. <u>Gould v. American-Hawaiian S.S.Co.</u>, 535 F.2d 761, 781 (3d Cir. 1976); see also <u>Rudinger v. Insurance Data Processing, Inc</u>., 778 F.Supp. 1334, 1340 (E.D.Pa.1991). Under <u>Gould</u>, "recovery is not limited to out of pocket loss, a diminution in the value of one's investment, but may include loss of a possible profit or benefit, an addition to the value of one's investment, unless the loss is wholly speculative." <u>Id.</u> at 781. In the Fifth Circuit, only plaintiffs who are actual purchasers or sellers of a security have standing to complain of a Rule 10b-5 violation, and they may only seek recovery of actual damages, "and not for loss of speculative profits." <u>Wolf v. Frank</u>, 477 F.2d 467, 478 (5th Cir. 1973).

In this case, plaintiffs' lost opportunity was their inability to enjoy the profits of the alleged misrepresentation they complain of – that OMNI was in play – by selling their stock at the artificially inflated price. It appears unlikely that the Fifth Circuit would adopt a "lost opportunity" measure of damages in light of <u>Wolf v. Frank</u>, 477 F.2d 467, 478 (5th Cir. 1973), and in the absence of clear authority that such is available in this circuit, and particularly under the circumstances of the "lost opportunity" in this case, the undersigned will not recognize such a measure of damages.

Plaintiffs have not pled any economic damages in the form of loss of value of OMNI stock. Therefore, the misrepresentations and omissions alleged to have caused a loss of value in OMNI stock due to insider raiding and insider trading need not be further analyzed. For all the above reasons, the undersigned will recommend that all 10(b) securities fraud claims relating to plaintiffs' alleged loss of value of their OMNI stock be dismissed.

3. Loss of Value of OMNI Notes

Plaintiffs allege OMNI has refused payment of its $3.2 million notes held by Rhyne and Trauth, due to OMNI's improper termination of their employment. However, OMNI's failure to pay its notes is not a purchase or sale of a security covered by the Act.

Plaintiffs allege OMNI has breached its promise to pay the notes; however, "[t]he failure to carry out a promise made in connection with a securities transaction is normally a breach of contract. It does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." Mills v. Polar Molecular Corporation, 12 F.3d 1170, 1176 (2nd Cir. 1993)(internal references omitted). The court in Gigliotti v. Mathys, 129 F.Supp. 2d 817 (D. Virgin Islands, 2001), explained the distinction between a breach of contract claim and a securities fraud claim as follows:

> Because Congress' two main concerns when it passed the 1934 Act were manipulation and speculation, a key factor in weeding out cases involving mere breaches of contract is whether the alleged misrepresentations were intended to induce a sale or purchase of a security at the time of sale or purchase. Thus, although a fraudulent promise made to induce a securities transaction may give rise to a claim under section 10(b), "the failure to carry out a promise made as consideration for a sale of securities ... does not constitute fraud if the promise was made with a good faith expectation that it would be carried out..."
> Gigliotti, 129 F. Supp. 2d at 823 - 24. (Internal citations omitted).

Plaintiffs have not alleged that defendants misrepresented the value of the OMNI notes, nor that OMNI had no intention to honor its notes at the time of entry into the SPSA. Instead, the defendants' alleged failure is one to carry out a promise – payment of the OMNI notes – made as consideration for a sale of securities. Plaintiffs have alleged damages from non-payment of the OMNI notes due to breach of contract, but not due to any violation of federal securities law.

For all the above reasons, the undersigned will recommend that all 10(b) securities fraud claims relating to plaintiffs' alleged loss of value in their OMNI notes be dismissed.

C.      Section 20(a) Claims

Section 20(a) of the Exchange Act defines control person liability as follows:

Every person who, directly or indirectly, controls any person liable under any provision of this title [chapter] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
15 U.S.C. § 78t(a).

The plaintiffs have failed to state any primary claim for violation of federal securities laws against any of the defendants, and thus the Section 20 claims against defendants should be dismissed, as "Control person liability is secondary only and cannot exist in the absence of a primary violation." Southland Securities Corp. v. Inspire Ins. Solutions, Inc., 365 F.3d 353, 383 (5th Cir. 2004), citing Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1021 n. 8 (5th Cir. 1996).

III.    Injunctive Relief

Plaintiffs ask for injunctive relief in the form of an order "preventing OMNI and Defendants from continuing to violate the securities laws by requiring full and complete corrective disclosures." (¶ 159(c)). However, it is unclear exactly what disclosures are alleged to contain material misrepresentations or omissions that are presently at risk of causing future irreparable harm to plaintiffs. See <u>Rondeau v. Mosinee Paper Corp.</u>, 422 U.S. 49, 59, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975)(holding that private litigants alleging violations of information requirements of the Act must show irreparable harm and inadequacy of legal remedies, according to traditional rules of equity, to entitle them to injunctive relief).

The alleged existing misrepresentations and omissions plaintiffs seek to have corrected are presumably those alleged misrepresentations or omissions previously discussed: Sciotto and Colson's intent to control OMNI; their business experience and relationships; and, their involvement in trading OMNI futures. The undersigned conjectures plaintiffs contend this information should have been disclosed and accurately reported in OMNI's SEC filings.

However, any harm Rhyne and Trauth allegedly suffered as a result of these alleged misrepresentations and omissions has already occurred. Plaintiffs do not adequately allege how the failure to correct any alleged misrepresentations or omissions would, at this point, cause plaintiffs Rhyne and Trauth future irreparable harm.

For the above reasons, the undersigned will recommend plaintiffs' request for injunctive relief in the form of an order to defendants to correct their alleged misstatements and omissions be dismissed.

In addition to seeking injunctive relief in the form of an order that defendants publish corrected information, plaintiffs ask the court to order the removal of Sciotto, Colson and

Gerevas from OMNI's Board of Directors. It is unclear what section of the Act Sciotto, Colson and Gerevas are alleged to be in violation of by their presence on OMNI's Board, or under what authority the undersigned could order their removal. In any case, as discussed above, any harm caused plaintiffs Rhyne and Trauth by Sciotto, Colson, and Gerevas' position on OMNI's board has already occurred.

The only irreparable harm to be prevented appears derivative in nature – that is, any relief would inure to the benefit of OMNI, in the form of protecting OMNI from further violations of securities laws and mismanagement.[20] However, plaintiffs have not alleged any claims on OMNI's behalf, only on their own.

In any case, plaintiffs have not alleged that OMNI has been damaged or has suffered irreparable harm in connection with the purchase or sale of any security. Instead, plaintiffs allege OMNI suffered harm in the form of damage to the value of its stock when its Board, through Sciotto, Colson and Gerevas, with the assistance of Mager and Cove, rejected offers for OMNI's purchase. Even if this harm is capable of repetition, and thus would qualify as "future irreparable harm," any damage to OMNI did not occur in connection with the purchase or sale of a security as required by Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

For these reasons, the undersigned will recommend that plaintiffs' claims for injunctive relief in the form of removal of Sciotto, Colson and Gerevas from OMNI's Board be dismissed.

IV.    ERISA Claims

---

[20]Plaintiff Rhyne still has some shares of stock in OMNI, and has standing to sue on OMNI's behalf.

The only remaining alleged federal law claims are those under ERISA. Defendants argue, and are correct, that plaintiffs' ERISA claim is "merely an element in damages related to a claim for wrongful discharge" and not an independent claim that states a separate claim for relief.[21] Plaintiffs allege they have been denied their ERISA benefits, but only due to their alleged wrongful discharge, and their claim for declaratory judgment that they are entitled to their ERISA benefits is tantamount to a claim that their employment was wrongfully terminated. See <u>Rozzell v. Security Services, Inc</u>., 38 F.3d 819, 822-23 (5th Cir. 1994).

Therefore, the undersigned will recommend that plaintiffs' claim for declaratory judgment that they are entitled to ERISA benefits be denied.

V.      State Law Claims

Pursuant to 28 U.S.C. §1367, a district court has supplemental jurisdiction over state law claims so long as the court has original jurisdiction over any federal claims. A district court may decline to exercise supplemental jurisdiction if the court has dismissed all claims over which it had original jurisdiction. 28 U.S.C. §1367(c)(3); <u>Nowell v. Acadian Ambulance Service</u>, 147 F.Supp.2d 495, 510 (W.D.La. 2001). Indeed, when a court dismisses all federal claims before trial, the general rule is to dismiss any pendent claims. <u>Bass v. Parkwood Hosp.</u>, 180 F.3d 234, 246 (5th Cir. 1999), citing <u>Wong v. Stripling</u>, 881 F.2d 200, 204 (5th Cir. 1989). However, the dismissal should be without prejudice. <u>Id.</u>

In light of the above analysis, the plaintiffs have stated no viable federal claim against the defendants and those claims should therefore be dismissed. Accordingly, no federal question

---

[21]See Memorandum in Support of Motion to Dismiss (rec. doc. 36), p. 34, citing <u>Rozell v.Security Services, Inc.</u>, 38 F.3d 819, 822-23 (5th Cir. 1994)(quoting <u>Burks v. Amerada Hess Corp.</u>, 8 F.3d 301, 305 (5th Cir. 1993).

will remain before this court. Therefore, it is recommended that this court decline supplemental jurisdiction over plaintiffs' state law claims, and dismiss those claims without prejudice to their reassertion in an appropriate state court.

### *Conclusion and Recommendation*

The plaintiffs have stated no claim for violation of federal securities law, nor have plaintiffs stated a claim for any ERISA violation as an independent claim.

For all the reasons given above, **IT IS RECOMMENDED** that the original motions to dismiss (Rec. Docs. 23 and 31) be **DISMISSED AS MOOT**;

**IT IS FURTHER RECOMMENDED** that defendants' superceding motions to dismiss (Rec. Docs. 35 and 40) be **GRANTED IN PART AND DENIED IN PART** as follows:

1) All of plaintiffs' federal law claims be **DISMISSED WITH PREJUDICE** for failure to state a claim;

2) All of plaintiffs' state law claims be **DISMISSED WITHOUT PREJUDICE** to their reassertion in an appropriate state court.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10)**

days following the date of its service, or within the time frame authorized by Fed.R.Civ.P.

6(b), shall bar an aggrieved party from attacking either the factual findings or the legal

conclusions accepted by the District Court, except upon grounds of plain error.  See

**Douglass v. United Services Automobile Association,** 79 F.3d 1415 (5th Cir.  1996).

Signed at Lafayette, Louisiana, on June 1, 2009.

_____
Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)